IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Civil Action No. 3:24-cv-771-FDW-DCK

KHAIRI WILLIAMS,

        Plaintiff,

v.

CITY OF CHARLOTTE; OFFICER
MATTHEW RATCHFORD, in his individual
and official capacity; OFFICER TAWAN
SKEEN, in his individual and official
capacity; SGT. JOSE TORRES, in his
individual and official capacity; OFFICER LAUREN
FEDEROWICZ, in her individual and official
capacity; ERIK TORRES in his individual
and official capacity,

        Defendants.

## PLAINTIFF KHAIRI WILLIAMS' RESPONSE IN OPPOSITIONS TO DEFENDANT RATCHFORD'S MOTION FOR SUMMARY JUDGMENT

    Plaintiff Khairi Williams, by and through undersigned counsel, hereby responds to

Defendant Ratchford's Motion for Summary Judgment (Doc. 79).

    This case arises from a December 11, 2021 encounter in which police responded to a

domestic disturbance at the home of Mr. Williams' ex-girlfriend and, after a brief interaction,

restrained and arrested Mr. Williams. On December 11, 2021, police arrived at the home of Mr.

Williams' ex-girlfriend, Ms. Smith, because Mr. Williams had called 911 after Ms. Smith began

punching and slapping him. The core factual disputes concern whether officers reasonably

perceived an ongoing threat, whether Mr. Williams was resisting once he was pinned and prone,

and whether the officers continued or escalated force after control had been achieved.

    Under governing Fourth Amendment principles, the reasonableness of force is a

fact-intensive inquiry that depends on the totality of the circumstances at each moment force was

1

used. The record here contains multiple material disputes: officers' testimony conflicts with Mr. Williams' account and with video evidence about whether the gun was secured, whether Mr. Williams was free to leave, and whether he posed a flight or safety risk once on the ground. Critically, Mr. Williams pleaded, 'I can't breathe' numerous times to officers, while gasping.

These contemporaneous complaints, along with evidence indicating that officers applied body-weight pressure while Mr. Williams was in a prone position and that he subsequently lost consciousness, raise triable issues regarding the necessity, duration, and proportionality of the force used.

For these reasons, summary judgment is inappropriate. When viewing the evidence favorably to Plaintiff, a jury could find that Officer Ratchford used excessive force, did not reassess as circumstances changed, and acted with reckless disregard for Mr. Williams' safety, key issues for both the Fourth Amendment claim and immunity defenses.

## STATEMENT OF FACTS

On December 11, 2021, police arrived at the home of Mr. Williams' ex-girlfriend, Ms. Smith, because Mr. Williams had called 911 after Ms. Smith began punching and slapping him. (P's Ex. A, Williams 123:14). During the altercation, Ms. Smith grabbed a gun and pointed it at Mr. Williams. (P's Ex. A Williams 124:18–19). Ms. Smith put down the gun and left with Mr. Williams' keys and wallet, and at that point, Mr. Williams put the gun in his parked car. (*Id*. 131:2–16). Mr. Williams was finally able to go outside, but she had taken his wallet and keys, so he then called the police. (*Id*. 126:16–22). Ms. Smith dropped their son, and Mr. Williams reported that the child had been dropped when he called 911. (*Id*. 135:18–24). Once the ambulance arrived, they took his son into the ambulance, but the paramedics would not allow

Mr. Williams to check on his son or otherwise tell him what was happening. (*Id.* at 135:19-136:11:2).

Defendant Officer Erik Torres spoke to Mr. Williams upon arrival at the home. *See* (Video Ex. 2[1]). Prior to the use of force, Officer Erik Torres told Mr. Williams that he was free to go. (P's Ex. A, Williams 136:12-19). Officer Torres admits that he had interactions with Mr. Williams that were not recorded on his body-worm camera. (P's Ex. E, Erik Torres 17:17-18:4). Officer Torres testified that he does not remember what he said to Mr. Williams during the time that his body worn camera was off. (P's Ex. E Erik Torres 18:22-19:4). Officer Ratchford also admitted that he did not have his body worn camera on during portions of his interactions with Mr. Williams. (P's Ex. B, Ratchford 22:25-23:16). Keeping a body worn camera off when speaking to a member of the public or a suspect in these circumstances is a violation of CMPD policy and Rules of Conduct (P's Ex. C Federowicz 31:4-3; P's Ex. H, CMPD Policy 400-006; P's Ex. G, Sec. (43)). Mr. Williams then spoke to Officer Ratchford. (Video Ex. 4 at 4:16 PM). The call notes, which were sent to Officer Ratchford's computer and were available for his review upon his arrival at the scene, stated that the gun was secured. (P's Ex. B, Ratchford 10:7–11;7). Officer Ratchford saw no weapon on Mr. Williams. (*Id.* at 25:5–6). Mr. William was wearing a hoodie with pockets, and while standing directly in front of Officer Ratchford, Mr. Williams reached into his pocket to take his cell phone out, before placing his cell phone back into his pocket. (Video Ex. 4 at 4:16:45–52 PM). Mr. Williams began walking away in the direction of another officer, but he stopped and turned around when Officer Ratchford spoke to him. (Video Ex. 4 at 4:17:10). At the time, no probable cause determination had been made about whether to arrest for domestic violence. (P's Ex. E, Erik Torres 19:5–20:3). At the time, the

[1] Video Exhibits 1-16 refer to videos submitted by City Defendants in support of their motion for summary judgment.

3

Officers had no reasonable basis to believe that Mr. Williams was carrying a gun. (*Id.* at 22:3-12). Officer Ratchford then announced that Mr. Williams was being detained. (*Id.*; P's Ex. A Williams 138:14-17). Officer Ratchford had not decided to arrest Mr. Williams at that point. (P's Ex. B Ratchford 14:19-21). Upon hearing he was being detained, Mr. Williams stopped walking, turned around and put his hands out to his sides with his hands visible, and asked what he was being arrested for. (Video Ex. 4 at 4:17:13 PM). Officer Ratchford would not tell Mr. Williams why he was being detained. (P's Ex. B, Ratchford 46:18–47:7). Officer Ratchford pinned Mr. Williams to a truck with the assistance of Sergeant Torres. (Video Ex. 4 at 4:17 PM). While being pinned to the truck, Mr. Williams put his arms up straight over his head. (Video Ex. 4 at 4:17 PM). Officer Federowicz joined in the force by grabbing Mr. Williams left arm, before stepping back and letting other officers continue to use force. (P's Ex. C Federowicz 36:13–24). Officer Federowicz was not concerned about Mr. Williams having access to any weapon, and she was aware that a weapon had been put away. (*Id.* at 51:7–16).

Officers Torres and Skeen joined Officer Ratchford, and the three took Mr. Williams to the ground and put him facedown. (Video Ex. 4 at 4:17-4:18 PM). Mr. Williams did not strike officers, nor did he attempt to flee (Video Ex. 4 at 4:17-4:18 PM). Mr. Williams was lying on the asphalt with his arms positioned behind his back. (Video Ex. 4 at 4:17:50-4:18:36 PM). The officers appeared to have difficulty applying the handcuffs, which was not due to any actions by Mr. Williams, as he did not resist or attempt to fight the officers. (Video Ex. 4 at 4:17:50-4:18:36 PM). Officer Skeen straddled Mr. Williams' legs to place handcuffs on him. (P's Ex. D Skeen 18:8–13). At the time that officers were attempting to handcuff Mr. Williams, he was not attempting to strike any officer, was posing no safety concerns, and was not a threat. (*Id.* at 19:2–21). Although Officer Federowicz had spoken to Officer Torres, she had not yet spoken to

Officer Ratchford. (P's Ex. C at 36:6–9). She stepped away when Mr. Williams was brought to the ground, finding that the situation was "under control" and that she was not needed. (*Id*. 37:9–13). Mr. Williams was not yanking his arm away from officers once pinned on the ground. (P's Ex. B at 54:14–18), (P's Ex. D at 21:4–5). When officers were trying to place handcuffs on Mr. Williams while restraining him, Officer Skeen was not concerned that Mr. Williams would flee. (P's Ex. D at 21:1–8).

Mr. Williams was having difficulty breathing because an officer's knee was on his neck and causing pressure. (P's Ex. A, Williams 145:1-17). Officer Ratchford is depicted with his knee in the middle of Mr. William's upper back and neck, applying pressure to Mr. William's body while he and Officers Skeen and Torres restrain Mr. Williams and attempt to handcuff him. (Video Ex. 7 at 4:18:21 PM.) Mr. Williams pleaded, "I can't breathe" numerous times to officers, while gasping. (*See e.g.*, Video Ex. 4 at 4:18PM). Upon learning that Mr. Williams could not breathe, Officer Federowicz did nothing to help him. (P's Ex. C, Federowicz 41:19–22). Sergeant Torres did not physically intervene to stop the use of excessive force (*E.g.*, Video Ex. 6 at 4:17:39 PM, 4:18:28 PM.) Although Officer Erik Torres called out Officer Ratchford' name in response to Mr. Williams' claims he could not breath, he and Officer Skeen continued to restrain and apply force to Mr. Williams, and Officer Ratchford shouted, "I'm on his fucking shoulders! Put handcuffs on!" (Video Ex. 6 at 4:18pm; P's Ex. B, Ratchford 57:23-59:16). Officer Ratchford ordered, "quit this bullshit—I can't breathe bullshit." (Video Ex. 7 at 4:18:21 PM.). Mr. Williams lost consciousness. (Video Ex. 4 at 4:18:44-4:19:09; P's Ex. C at 62:17–19). His eyes rolled into the back of his head. (*Id*. at 47:7–10). The loss of consciousness appeared to last approximately 30 seconds. (Video Ex. 7 at 4:18:38–4:19:07). Ms. Smith yelled, "What did y'all do to him?!" and ran over to Mr. Williams. (Video Ex. 4 at 4:18–4:19pm). Mr. Williams'

5

stepchild became upset and ran over to Mr. Williams and cried, "Daddy! I want my daddy!" (Video Ex. 4 at 4:19pm). The Officers actions in the use of force and failure to intervene in this case violated CMPD policy and CMPD Rules of Conduct. (P's Exhibit F, CMPD Policy 600-019; P's Ex. G, Rule of Conduct, Secs. (23) and (40). After the use of force incident, the fact that Mr. Williams' loss of consciousness was not included within the report that Officer Federowicz drafted. Failure to include this information also violated CMPD Rules of Conduct. (P's Ex. C. Federowicz 66:6-20; P's Ex. G, Rules of Conduct, Sec. (30).

Officer Torres stated that Mr. Williams was never being detained when speaking with officers, and that they were making sure he was okay, but that the reason he was eventually detained was because they were conducting an investigation and needed him to remain on-scene for the investigation. (Video Ex. 15 at 5:00:20-5:01:20pm).

After being arrested, Mr. Williams spent two days in jail, remaining in the infirmary throughout his stay. (P's Ex. A, Williams 147:25-148:14). One day he could barely move. (*Id*. at 148:23–149:1).

## STANDARD OF REVIEW

Summary judgment is appropriate only where the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual dispute is genuine if a reasonable jury could return a verdict for the nonmoving party, and a fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, the court must view the evidence in the light most favorable to the nonmoving party, credit the non-moving party's evidence, and draw all reasonable inferences in their favor. *Id.* at 255. The court may not weigh evidence, make credibility determinations, or resolve conflicts in the record.

6

*Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). Where the resolution of a claim depends on the credibility of witnesses or the reasonableness of competing interpretations of the evidence, summary judgment must be denied. *Id.*

This principle applies with particular force in excessive-force cases, which are inherently fact-intensive and turn on the totality of the circumstances confronting officers at the moment force was used. *Graham v. Connor*, 490 U.S. 386, 396 (1989). The objective-reasonableness inquiry does not lend itself to mechanical application and requires careful attention to the evolving circumstances of the encounter. *Id.* Courts must be careful not to substitute their own judgment for that of a jury when the record permits differing conclusions about the necessity, degree, or duration of force. *Id.*

With respect to video recordings, as the Fourth Circuit has recently clarified, the existence of video recordings does not authorize courts to resolve ambiguities, reject a plaintiff's account because it appears less persuasive, or credit an officer's interpretation over competing reasonable inferences. *Bermeo v. Andis* (163 F.4th 87 4th Cir. 2025). Disbelief, skepticism, or a conclusion that the plaintiff's account is unlikely does not equate to blatant contradiction. *Id.* When a video is susceptible to more than one reasonable interpretation, it must be interpreted in favor of the non-movant, and a factual dispute exists for the jury to decide. *Cooper v. Doyle Cooper v. Doyle* Civil Action No. DKC 22-0052, 2022 U.S. Dist. LEXIS 207067 (D. Md. Nov. 14, 2022).

## **ARGUMENT**

## I.  **SUBSTANTIAL EVIDENCE SUPPORTS PLAINTIFF'S EXCESSIVE FORCE CLAIMS.**

The evidence supports Plaintiff's claims of excessive force against Defendant Ratchford, as the record viewed in the light most favorable to Plaintiff demonstrates that a reasonable jury

could find Ratchford used objectively unreasonable force in violation of Plaintiff's Fourth Amendment rights, and that this right was clearly established at the time of the incident.

Excessive force cases are inherently fact-intensive and turn on the totality of the circumstances confronting officers at the moment force was used. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Claims of excessive force are governed by the Fourth Amendment's objective reasonableness standard. *Graham*, 490 U.S. at 395–97. Reasonableness should be evaluated based on what a reasonable officer would perceive at the scene, but if there are disputed facts that allow for different interpretations, it is up to a jury to resolve them. *Id.* The analysis requires consideration of the severity of the crime at issue, whether the suspect posed an immediate threat to officer safety, and whether the suspect was actively resisting or attempting to evade arrest. *Id.* Even where some force is initially justified, officers must continually reassess the need for force as circumstances evolve. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).

Continued or escalated force may become unreasonable once a suspect is subdued, restrained, or no longer poses an immediate threat, and whether officers reasonably adjusted their conduct in response to changing circumstances is a question for the jury. *Id.* Officers are not authorized to apply or maintain significant force based on generalized labels ("resistance") untethered to what was occurring at the time the force was used. *Graham*, 490 U.S. at 396. Moreover, as *Kingsley v. Hendrickson* emphasizes, continued force after control is achieved may be unreasonable where officers fail to temper or limit force once the justification for it dissipates. 576 U.S. 389, 397 (2015).

Here, the record contains multiple material disputes that must be presented to a jury. Officer Ratchford used excessive and unnecessary force in pinning Mr. Williams up against a car and taking him to the ground. Mr. Williams testified that Officer Erik Torres told him he was free

to go, he began to walk away, then stopped when Officer Ratchford announced he was being detained; he immediately turned, put his hands up, and asked why he was being detained. (P's Ex. A Williams 136:12–19; 138:23–139:7.). Even if force was justified at some point, the continuation and escalation of force to the extent that it restricted Mr. Williams ability to breath and resulted in unconsciousness was not. Defendant Ratchford continued to pin Mr. Williams to the ground with his leg while Mr. Williams repeatedly complained he could not breathe, and then Mr. Williams lost consciousness. (P's Ex. A, Williams 145:1–17; Ex. C Federowicz 47:7–10; Video Exs. 4 and 10 at 4:18–4:19pm.). At the point when Mr. Williams was laying face down on the ground and was barely moving, let alone fighting the officers, force became unnecessary. The seriousness of the crime does not warrant the force used, so this *Graham* factor supports Plaintiff. Furthermore, there are factual disputes issues that Defendant Ratchford raised in support of his argument that the severity of the crime justified the force used. At the time that Officer Torres was discussing the investigation with Officer Federowicz, after each officer had spoken to each party, no probable cause determination had been made. (P's Ex. D, Erik Torres 19:5–20:3). Defendant Ratchford completely disregards that Mr. Williams was the party that called the police to complain that he was a victim of domestic violence. Mr. Williams initially called the police after Ms. Smith punched and slapped him, grabbed a gun and pointed it at him, and took his wallet and keys. (P's Ex. A, Williams 123:14, 124:18–19, 126:16–22).

The second *Graham* factor, whether Plaintiff posed an immediate threat to officers or others, strongly favors Plaintiff. Even if Defendant argues he perceived a need to control Plaintiff at the outset, the evidence is sharply disputed as to whether Plaintiff posed any immediate threat once prone and restrained by multiple officers. Plaintiff's account is that he was face-down on pavement with officers controlling his limbs and applying body-weight pressure while he said

9

repeatedly that he could not breathe. Substantial evidence exists that Mr. Williams was not posing an immediate threat to the safety of officers or others. When Mr. Williams was walking away from Officer Ratchford, he had been told by another officer shortly before, that he was free to leave. (P's Ex. A, Williams 136:12-19). The issue of whether Plaintiff was free to leave affects how a jury would evaluate Mr. Williams' movements and his state of mind, including the issue of whether he was knowingly resisting, as opposed to being legitimately confused as a member of law enforcement had already told him that he was free to leave.

Even accepting Defendant's assertion that a weapon was associated with the earlier investigation, Graham requires that any threat be immediate and tied to the moment force is applied. 490 U.S. at 396. The record permits a finding that once Plaintiff was pinned face-down by multiple officers, with his limbs controlled and handcuffing in progress, any speculative concern about weapon access had dissipated. Several officers testified they did not perceive a flee risk or immediate danger while Plaintiff was prone. A jury could reasonably conclude that hypothetical access to a weapon somewhere in the vicinity does not constitute an immediate threat justifying continued compressive prone restraint.

Furthermore, at the point when Mr. Williams was prone, outnumbered, and vocalizing difficulty breathing, Officer Ratchford continued aggressive restraint contravened CMPD's policy, which mandates that officers attempt to de-escalate situations using verbal dialogue and other de-escalation techniques (P's Ex. F, CMPD Policy 600-019, Sec. IV.B.1). According to CMPD's own policy, the degree of control exercised must be proportional and not exceed what is necessary (P's Ex. F, CMPD Policy 600-019, Sec. IV.A.3). The fact that three officers applied physical force to Mr. Williams while he lay face-down on the asphalt creates, at minimum, a jury question regarding whether this response was proportional under CMPD policy. Furthermore,

CMPD's "Response to Resistance" policy requires officers to be aware of the risk of positional asphyxia and utilize restraint techniques that do not hinder breathing. Despite Mr. Williams repeatedly yelling "I can't breathe," Officer Ratchford continued to apply pressure to his body while he was in the prone position, leading to his loss of consciousness (P's Ex. F, CMPD Policy 600-019, Sec. IV.E.7).

Defendant Ratchford ignored the substantial evidence that officers did not perceive Mr. Williams as a threat to their own safety. To justify the force used after the fact, Defendant Ratchford testified that there is "always that potential [for imminent concern to safety]" unless handcuffed. (Ex. B Ratchford 83:12–24). But the call notes informed the officers that the weapon was secured and Officer Ratchford was sent this information and it was available for his at the time he arrived on scene. (P's Ex. B Ratchford 10:7–19). *Id*. at 10:7–19). Officer Ratchford saw no weapon on Mr. Williams. (*Id*. at 25:5–6). *Graham* requires the Court to assess reasonableness at the moment force was applied, not based on a generalized "weapons may exist" narrative. 490 U.S. at 396. Defendant Ratchford fails to articulate any legitimate threat that would justify the continued use of force against Mr. Williams once he was on the ground, restrained in a prone position, not fighting, unable to access a weapon, and experiencing medical distress.

Defendants' reliance on Mr. Thompson's expert opinion does not entitle them to summary judgment. An expert's view that officers acted consistently with training does not resolve whether the force was constitutionally reasonable under the Fourth Amendment. See *Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (objective reasonableness governs excessive force analysis). The constitutional inquiry turns on what was reasonable at the moment the force was used and whether officers reassessed as circumstances evolved. *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Even if a knee-placement technique is generally taught in the abstract,

11

a jury may conclude that continuing prone pressure after Plaintiff was face-down, controlled by multiple officers, and stating "I can't breathe" was unreasonable. An expert's characterization of the maneuver as "textbook" does not eliminate genuine disputes of material fact or permit the Court to resolve credibility issues at summary judgment. Furthermore, expert testimony is not required where the reasonableness of force and adequacy of training can be evaluated based on video evidence and officer testimony.

The third *Graham* factor, whether Plaintiff was actively resisting or attempting to evade arrest by flight, likewise turns on disputed facts that must be resolved by a jury. Defendant characterize Plaintiff as resisting and potentially fleeing. Critically, even if the jury were to believe that Mr. Williams resisted at some earlier point, the controlling question under *Graham* and *Kingsley* is whether resistance continued at the time the challenged force was applied and whether force was tempered once control was achieved. *Graham*, 490 U.S. at 396; *Kingsley*, 576 U.S. at 397. The most significant force continued after Mr. Williams was on the ground and restrained. Officers' testimony conflicts on whether Plaintiff posed a flight risk while prone and whether the continued pressure was necessary. A reasonable jury could find that whatever resistance Defendants claim existed earlier had ceased once Plaintiff was pinned, making continued prone restraint and body-weight pressure objectively unreasonable.

The record evidence demonstrates that genuine issues of material fact exist regarding Plaintiff's actions and the officers' perceptions at the time force was used. Specifically, the parties dispute whether Plaintiff was fleeing or merely walking toward another officer when Officer Ratchford announced his arrest, while the officers assert that they perceived flight, Plaintiff's evidence presents a distinctly different version of events. There is also a significant factual dispute over the nature and degree of Plaintiff's resistance, both before and, most

12

importantly, after he was on the ground and restrained by multiple armed officers. While officers have described Plaintiff as actively resisting by pulling away and flailing, video evidence depicts Plaintiff with his hands raised, neither striking anyone nor attempting to flee. At the critical moment, when Plaintiff was on the ground and restrained by several officers, it remains genuinely disputed whether he was resisting arrest or, instead, struggling to avoid serious harm. Furthermore, Officer Ratchford testified that his knee was not fully pressing on Plaintiff's back, a fact that Plaintiff controverts; which account is accurate is a question for the jury to resolve.

Defendant's suggestion that Plaintiff was not "secured" because he had not yet been handcuffed misstates clearly established Fourth Circuit law. In *Estate of Jones v. City of Martinsburg*, 961 F.3d 661, 668 (4th Cir. 2020). The Fourth Circuit held that suspects may be secured without handcuffs when they are pinned to the ground by officers, and that, as early as 1993, it was clearly established that once a suspect is pinned and controlled, further force may be unconstitutional. There, the court recognized that a reasonable jury may find a suspect secured even absent handcuffs where multiple officers physically restrain him on the ground. Id. Here, Plaintiff was face-down on asphalt, controlled by multiple officers, with limbs restrained and handcuffing underway. Under the Estate *of Jones*, a jury could conclude Plaintiff was effectively secured at the moment continued compressive force was applied, even though the cuffs were not yet locked in place.

Furthermore, there are factual disputes concerning the nature and degree of force itself, including knee placement and body-weight pressure while Plaintiff was face-down and complaining he could not breathe. Plaintiff testified he felt pressure into the neck area; officers describe shoulder-blade placement. Defendant Ratchford argued that Sergeant Torres was viewing the force he used on Mr. Williams and found that his positioning was appropriate.

However, the evidence is clear that the positioning, pressure, and length of the restraint were enough to result in Mr. Williams having trouble breathing and losing consciousness.

Significant video evidence exists of the incident. But a court may disregard a party's version of the facts if the video evidence "blatantly contradicts" that account, making it impossible for any reasonable jury to believe it. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The Fourth Circuit's decision in *Bermeo v. Andis* confirms that courts may not use recordings to weigh evidence, resolve ambiguities, or credit officers' interpretations over competing reasonable inferences; disbelief or skepticism does not equal blatant contradiction. *Bermeo v. Andis* 163 F.4th 87 (4th Cir. 2025). *Cooper v. Doyle* further establishes that when the reasonableness of force depends on the timing and changing circumstances of an encounter, courts cannot simply treat the incident as a single, undivided event to sidestep having a jury decide those disputed issues. *Cooper v. Doyle* Civil Action No. DKC 22-0052, 2022 U.S. Dist. LEXIS 207067 (D. Md. Nov. 14, 2022).

The evidence demonstrates that the recordings do not capture all relevant interactions, including certain officer communications with Mr. Williams, do not conclusively establish ongoing resistance once Plaintiff was restrained, and do not resolve disputes regarding the force applied after Plaintiff was on the ground and under control. Importantly, Officer Ratchford admitted that his own body worn camera was not on during some of his interactions with Mr. Williams. As such, key facts in this case are missing from video evidence because officers failed to comply with CMPD's "Body Worn Camera" policy during their encounters with Mr. Williams. CMPD Policy 400-006 requires the Chief of Police, executive staff, captains, lieutenants, sergeants, and all patrol officers to ensure and maintain compliance with BWC use (P's Ex. H, CMPD Policy 400-006, Sec. IV). The policy mandates that BWCs must be activated

prior to any call for service or crime-related citizen interaction, and recording must continue until the incident ends or becomes a criminal investigation (Sec. IV(F)(17), (37)). Stopping the BWC is only permitted during non-enforcement activities or when adversarial events have ceased (Sec. IV(F)(19), (20)). Because officers, including Officer Ratchford, did not consistently follow these directives, crucial aspects of what occurred with Mr. Williams are not captured on video (P's Ex. H, CMPD Policy 400-006).

These are material factual disputes that, pursuant to *Scott, Bermeo,* and *Cooper*, must be resolved by a jury.

## II.    DEFENDANT IS NOT ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity only shields officers from liability only where no constitutional violation occurred or where the right at issue was not clearly established at the time of the conduct. *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022), *Ashcroft v. al-Kidd,* 563 U.S. 731, 131 S. Ct. 2074 (2011). In determining qualified immunity at summary judgment, the Fourth Circuit applies a split burden: the plaintiff bears the burden of showing that the facts, taken in the light most favorable to him, establish a constitutional violation, while the defendant bears the burden of showing that the right was not clearly established. *Id.* Where the qualified-immunity analysis depends on disputed facts, including disputes about the amount of force used, the justification for that force, or whether the force remained necessary, qualified immunity cannot be resolved as a matter of law. *Id.* at 234. Courts may not accept an officer's version of events to grant immunity where a reasonable jury could credit the plaintiff's evidence. *Lee*, 863 F.3d at 327. No case with identical facts is required. Rather, existing precedent must place the constitutional question beyond debate. *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892 (2016).

15

Well before the events at issue in this case, it was firmly established that officers are prohibited from using force that is excessive in relation to the threat presented or from continuing to use force once its justification no longer exists. *Graham*, 490 U.S. at 396; *Kingsley*, 576 U.S. at 397. The core rule is not a hyper-specific "no knee-to-shoulder-blade" rule; it is the clearly established principle that officers may not use force that is objectively unreasonable under the circumstances and may not continue force once the justification dissipates. *Graham*, 490 U.S. at 396; *Kingsley*, 576 U.S. at 397. Defendant Ratchford attempts to frame the qualified immunity analysis as pertaining to comments he made when using force, likely referring to the "I can't breathe bullshit" comments. At issue is the force that Defendant Ratchford used, and especially, the force that he continued to use after Mr. Williams repeatedly told him that he could not breathe. The inquiry asks whether existing precedent placed the constitutional question beyond debate, not whether a prior case mirrors the facts in every detail. *Stanton*, 25 F.4th at 233.

Qualified immunity also fails for the separate reason that its application hinges on several disputed facts central to the reasonableness inquiry. These include whether Plaintiff was still resisting after being restrained, whether officers reasonably perceived a threat while Plaintiff was prone, whether officers continued to apply body-weight pressure despite repeated complaints about breathing, and whether Plaintiff's loss of consciousness was genuine. Furthermore, consideration of whether Officer Ratchford's actions in this case violated CMPD policies on use of force and CMPD Rules of Conduct.

Under *Stanton*, where the qualified immunity analysis depends on which version of events a jury credits, immunity cannot be decided as a matter of law at summary judgment. 25 F.4th at 234. For these reasons, Defendants' motion must be denied as to qualified immunity.

### III. DEFENDANT IS NOT ENTITLED TO PUBLIC OFFICIAL IMMUNITY UNDER STATE LAW.

16

Defendant is likewise not entitled to North Carolina public official immunity on Plaintiff's state-law claims (including assault and battery and negligence) because the record would permit a reasonable jury to find that the officers acted willfully, wantonly, or maliciously. Under North Carolina law, public official immunity protects officers only for discretionary acts performed within the scope of their authority and without malice. *Bartley v. City of High Point*, 873 S.E.2d 525, 531 (N.C. 2022). The immunity does not apply where an officer acts with malice, corruption, or reckless indifference to the rights and safety of others. *Grad v. Kaasa*, 321 S.E.2d 888, 890–91 (N.C. 1984); *McCarn v. Beach*, 496 S.E.2d 402, 404 (N.C. App. 1998). Malice may be shown not only by personal animus, but by wanton conduct, conduct manifesting reckless disregard for the consequences and for others' rights and safety. *Grad*, 321 S.E.2d at 890–91. Whether an officer acted with malice or wantonness is typically a jury issue where the evidence supports competing inferences. *Bartley*, 873 S.E.2d at 531.

Here, Plaintiff has proffered evidence that goes beyond ordinary negligence and supports an inference of reckless indifference during the most critical phase of force: while Plaintiff was restrained, face-down, and repeatedly yelling that he could not breathe. The record supports an inference that officers perceived Mr. Williams' distress and continued to restrain and attempt to handcuff him anyway. A reasonable jury could view this as evidence of continued force in the face of explicit warnings, thus supporting wantonness. Further supporting this position is the fact that Officer Ratchford's actions herein violated numerous CMPD policies and CMPD Rules of Conduct.

The ongoing disputes regarding the use of force and Plaintiff's alleged resistance are central to the issue of public official immunity. Specifically, there remains a genuine question as to whether Plaintiff was actively resisting after being brought to the ground, whether he was

attempting to escape, and whether the officers reasonably perceived a continued threat while Plaintiff was in a prone position.

There is also a dispute over the nature of the force applied, knee placement (shoulder blade vs. neck area), body-weight pressure, and the duration of prone restraint while Plaintiff was pleading inability to breathe. If a jury credits Plaintiff's account that he was restrained and no longer a threat while officers continued applying significant pressure, then a jury could also infer that the conduct was reckless and wanton under *Grad* and thus outside the scope of public official immunity. *Bartley*, 873 S.E.2d at 531.

Here, Plaintiff has presented substantial evidence from which a jury could conclude that Defendant consciously disregarded a known and serious risk to Plaintiff's safety after he was restrained on the ground. Officer Ratchford responded cruelly to Mr. Williams' begging for help, yelling at him to quit the "I can't breathe bullshit." A jury could reasonably view this statement not as momentary poor judgment, but as evidence that Ratchford was aware of Plaintiff's distress and consciously chose to disregard it. Further supporting this is the fact that Ratchford's actions violated numerous CMPD policies and CMPD rules of conduct.

## IV.    PLAINTIFF'S PUNITIVE DAMAGE CLAIM MUST NOT BE DISMISSED.

Since Officer Ratchford is not entitled to summary judgment on any of the claims, the claim for punitive damages should remain and not be dismissed. Punitive damages are recoverable under either § 1983 or North Carolina law when conduct is "motivated by evil motive or intent" or involves "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

18

The same reasons why Defendant Ratchford is not entitled to public official immunity apply to the issue of punitive damages. Substantial evidence exists of Defendant Ratchford's malice and indifference. Accordingly, Plaintiff's punitive damages claim must proceed to trial.

## **CONCLUSION**

For the foregoing reasons, Defendant Ratchford's Motion for Summary Judgment should be denied in its entirety.


*/s/ Darlene Harris*
Darlene Harris
N.C. State Bar No. 46087
Power In Protection
1026 Jay Street B184
Charlotte, NC 28205
Telephone: (704) 313-8816
Email:Darlene@powerinprotection.com

*Counsel for Plaintiff*

**CERTIFICATION OF COMPLIANCE WITH**
**STANDING ORDER IN RE: USE OF ARTIFICIAL INTELLIGENCE**


I hereby certify that the foregoing memorandum complies with the requirements set forth in this Court's Standing Order In Re: Use of Artificial Intelligence (3:24-mc-104). No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, CaseText, and Bloomberg.

Every statement and every citation to an authority contained in this document has been verified by an attorney in this case and/or a paralegal working at his/her direction as to the accuracy of the proposition for which it is offered, and the citation to authority provided.


Dated: February 20th , 2026

Respectfully submitted,

> */s/ Darlene Harris*
> Darlene Harris
> N.C. State Bar No. 46087
> Power In Protection
> 1026 Jay Street B184
> Charlotte, NC 28205
> Telephone: (704) 313-8816
> Email:Darlene@powerinprotection.com
>
> *Counsel for Plaintiff*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.3:24-CV-00771-MEO-DCK.

**KHAIRI WILLIAMS**

                         **Plaintiff,**

         **v.**

**CITY OF CHARLOTTE et. al.**
                         **Defendants.**

I, Darlene Harris , hereby certify that I have this day electronically served the foregoing **RESPONSE TO DEFENDANT RATCHFORDS MOTION FOR SUMMARY JUDGMENT**  using the CM/ECF system, which will send notification of the filing to all counsel of record.

Respectfully submitted, this 20th  day of February 2026.

_/s/ Darlene Harris_
Darlene Harris
N.C. State Bar No. 46087
Power In Protection, PLLC
E-mail: _Darlene@powerinprotection.com_
_Counsel for Plaintiff_

21